UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID SPRINGSTEEN,

        Plaintiff,

v.                                    Case No. 11-11743
                                       Honorable Patrick J. Duggan

CATHY M. GARRETT, WAYNE
COUNTY, LYNN M WADE,
CAVEN WEST, and JOHNNIE JOHNSON,

        Defendants.
_____/

## OPINION AND ORDER

On April 21, 2011, Plaintiff David Springsteen ("Springsteen") filed this action
against Wayne County and the following Wayne County employees in their individual
and official capacities: Wayne County Clerk Cathy Garrett ("Garrett"), Deputy Wayne
County Clerk Caven West ("West"), former Chief of Staff Johnnie Johnson ("Johnson"),
and Acting Chief of Staff and Chief Deputy Circuit Court Clerk Lynn Wade ("Wade").
In his Complaint, Springsteen asserts violations of his First Amendment rights pursuant to
42 U.S.C. § 1983, claiming he was terminated from his position as Deputy Chief of Staff
of the Wayne County Clerk's office ("Clerk's office") in retaliation for his reports of
misconduct by employees within the Clerk's office to the internal affairs division of the
Wayne County Sheriff's Department (Count I) and in retaliation for his union-filed
grievance protesting his working conditions (Count II).  Springsteen also alleges a
Michigan's Whistleblower Protection Act claim against Garrett and Wayne County

(Count III).  On April 19, 2012, the parties stipulated to the dismissal of Wade from this action.  (Doc. 38.)

Presently before the Court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), filed by Wayne County and the remaining defendants in their official capacities on May 16, 2012.  (Doc. 39.)  On the same date, Garrett, West, and Johnson, in their individual capacities, filed a notice indicating their concurrence in the motion for summary judgment.  (Doc. 41.)  In response to the summary judgment motion, Springsteen voluntarily agreed to dismiss Count II of his Complaint.  (Doc. 48.) Springsteen filed a response to the motion on June 11, 2012 (Doc. 45); Wayne County and the individuals sued in their official capacities filed a reply brief on June 22, 2012. (Doc. 50.)  A reply brief was filed on behalf of Garrett, West, and Johnson in their individual capacities on June 25, 2012.  (Doc. 51.)  To the extent that the individual defendants use this latter reply brief to raise arguments not asserted in the motion for summary judgment, they will not be considered by the Court.  *See Resolution Trust Corp. v. Townsend Assoc. Ltd. P'ship*, 840 F. Supp. 1127, 1142 n.15 (E.D. Mich. 1993) (citing *United States v. Jenkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("[I]t is well-settled that a party may not raise new issues for the first time in a reply brief.")).

## I.    Factual Background

On December 6, 2004, the Wayne County Clerk's office appointed Springsteen to a Department Executive I position.  This is an at-will position, filled by appointment at the sole discretion of the Wayne County Clerk, i.e. Garrett.  Springsteen's job duties

2

included, among other things, "provid[ing] administrative assistance to the Wayne County Clerk and Chief Deputy County Clerk." (Defs.' Mot. Ex. 10.) Sometime between September 2008 and January 2009, Garrett gave Springsteen the title of Deputy Chief of Staff. Plaintiff, however, remained classified as a Department Executive I and did not receive a pay increase.

Sometime in Fall 2009, Garrett had concerns with the operations of the CCW unit, a part of the Clerk's office's Vitals department which processes gun permit applications. The unit was receiving negative feedback from the public and there was a CCW permit processing backlog, although such backlogs were not uncommon throughout the Clerk's office due to staffing shortages that existed since 2005 or 2006. Garrett assigned Springsteen to supervise the CCW unit and fix its problems.

The CCW unit is dependent upon the Wayne County Sheriff and Michigan State Police to process CCW permits. As supervisor of the CCW unit, Springsteen regularly interacted with these agencies.

In late May or early June, 2010, Johnson learned that a specified employee in the Clerk's office had been "de-activated" from access to the Michigan State Police ("MSP") database. (Pl.'s Resp. Ex. 11.) West contacted the State Police and Sheriff's Department concerning this decision and was informed that the Clerk had too many people entering data into the MSP system. (*Id.*) In response, a meeting was requested with Wayne County Sheriff's Deputy Ramon Alam. (*Id.*) The meeting was held on June 4, 2010, with the following individuals, among others, in attendance: Garrett, West, Johnson,

Springsteen, the deactivated employee, and Alam.  (*Id.*)  Among other issues discussed at the meeting, Alam expressed that there were too many people in the Clerk's office with access to the MSP database and that the Wayne County Sheriff Internal Affairs ("IA") unit was investigating allegations that county employees were issuing concealed weapons permits for $50,000 and approving permits that should have been denied.  (*Id.*)

According to Springsteen, Garrett inquired of Alam whether anyone at the meeting was being investigated.  (Pl.'s Resp. Ex. 3 at 154.)  Alam stated that the employee whose access had been disabled and who was at the meeting was part of the investigation.  (*Id.*)  Springsteen conveyed during his deposition in this case that, in response, "[t]here was a big explosion from the clerk [Garrett] and [the de-activated employee] and some yelling." (*Id.* at 153-55.)  Garrett yelled that if the employee was being accused, then she had a right to face her accusers.  (*Id.*)  Springsteen described Garrett as being "outraged that somebody could be investigating in her office and she hadn't been notified[.]"  (*Id.* at 159.)

In August 2010, Springsteen was engaged in "a normal day to day discussion" with Deputy Art Elandt, who took over the Sheriff's office's CCW operations in July 2010.  (Defs.' Mot. Ex. 14.)  The discussion concerned an arrestee who had a "valid-looking" CCW permit even though his permit should have been denied.  (Pl.'s Resp. Ex. 3 at 187-88.)  Elandt instructed Springsteen to speak with Wayne County Sheriff's Deputy Chief James Spivey.  After discussing the matter with Spivey, Spivey "picked up the phone and called Internal Affairs and they asked [Springsteen] to come over."  (*Id.* at

4

188.)

Springsteen went to Internal Affairs (hereafter "IA") that afternoon and spoke with the department head.  Springsteen was asked about the arrestee's permit, who used to issue permits before he took over the CCW unit, and what the unit's process was for issuing a permit.  (Defs.' Mot. Ex. 14.)  Springsteen was told that there was a lengthy ongoing investigation concerning the issuance of permits by three Clerk's office employees and he was asked whether he believed West, Garrett, and/or Johnson were involved.  (Pl.'s Resp. Ex. 3 at 192-93.)  In response, Springsteen said "no."  (*Id*.)  The head of IA advised Springsteen to not inform anyone else about the interview or IA's investigation.  (*Id*. at 199.)

Within the following two weeks, Shannon Emerick at IA contacted Springsteen by telephone on two occasions.  (*Id*. at 190, 194-95.)  Springsteen was not able to speak with Emerick the first time she called; during the second conversation, Emerick asked Springsteen only a few questions which concerned Garrett's relationship with one of the employees being investigated and the relationship between two of the employees being investigated.  (*Id*. at 196-97.)

On September 1, 2010, Johnson formally announced her retirement from Wayne County.[1]  At that time, her duties were divided between West and Wade and Wade became Acting Chief of Staff of the Clerk's Office.  On September 2, Springsteen spoke

_____

[1]Johnson's retirement was not effective until March 1, 2011.

5

with Wade regarding the CCW unit, specifically the need for employees to work overtime to cover backlog and the volume of work.  In response, Wade suggested that Springsteen utilize one of the employees who (unbeknownst to her) was under investigation by IA. Springsteen therefore told Wade about the IA investigation and Wade asked him if had spoken to IA.  In response, Springsteen said "yes."  Wade asked Springsteen if Garrett knew that he had spoken with investigators, and he told her "no," and that IA asked him not to share the information with the Clerk's office.  (Pl.'s Resp. Ex. 4 at 33.)

Wade immediately told Garret, Johnson, and West that Springsteen had been questioned by IA.  (*Id*. at 36-37.)  A short time later the same day (September 2), Springsteen was called into a conference room for a meeting with West, Johnson, Garrett, and Wade.  (Pl.'s Resp. Ex. 3 at 209.)  Springsteen was asked when he had spoken with IA, what specifically he had said, and why he had not told anyone in the Clerk's office that he was speaking with IA.  (*Id*.)  Garrett also "lectured" him "about [his] loyalty to the [C]lerk."  (*Id*. at 209, 211-12)  Garrett told Springsteen that she was "disappointed in [him] for his action, [he] should have informed her out of loyalty to her, she was the one who brought [him] to the table . . . she chose [him] and [he] disappointed her."  (*Id*. at 211-12.)

At the conclusion of the meeting, Springsteen was directed to sign a memo regarding "Visitors to the Workplace" that read, in part:

> You have been notified on multiple occasions you must notify Ms. Garrett, Mr. West or the Chief of Staff in the event that there are any inquiries or requests for interviews from the media or law enforcement agencies,

6

> including any and all matters out of the ordinary, and not in the usual course of business.
>
> Recently, there was an investigation of these divisions from an outside entity, which you failed to notify anyone of. It is mandatory that you inform the designated persons immediately, of such requests.

(Pl.'s Resp. Ex. 12.) Wade testified during her deposition in this case that although she was identified as the author of this memo, West dictated the memo and Garrett and West ordered that the memo be issued and that she sign it. (Pl.'s Resp. Ex. 4 at 49, 52, 251.) During their depositions in this case, West, Garrett, and Johnson denied authoring the memo and Garrett and Johnson claimed to have "no idea" as to what Springsteen had done, or who he had spoken with, that led to the issuance of this "friendly reminder." (*Id.* Ex. 7 at 156, 264; Ex. 5 at 98-99, 102-03, 106, 108; Ex. 6 at 66-68, 71, 73.) Garrett testified, however, that the memo reflects the standard policy/protocol of her office. (*Id.* Ex. 5 at 101-02.)

Springsteen claims that Garrett never spoke to him again after September 2, 2010– the day his communications with IA were revealed to her. (Pl.'s Resp. Ex. 3 at 223.) According to Wade, after learning about Springsteen's role in the IA investigation, Garrett stated that she "can't stand the sight of [Springsteen's] face"; "she didn't trust him"; and she "couldn't trust him anymore" because "[h]e didn't come to her with information about the investigation." (*Id.* Ex. 4 at 127-78, 162-63.) Wade testified that Garrett expressed concerns about Springsteen continuing to work in the CCW unit and stated several times that "she wanted [Springsteen] out." (*Id.* at 91-92, 148, 162-63.)

7

During her deposition, Garrett denied making these statements.  (Pl.'s Resp. Ex. 5 at 145-46.)

Springsteen claims that, after learning about his discussions with IA, Defendants manufactured a pretext to terminate his employment.  According to Springsteen, West began to scrutinize and nitpick Springsteen's work and regularly changed deadlines and protocols to make it impossible for Springsteen to comply with his assignments.  (Pl.'s Resp. Ex. 3 at 89, 94-97, Exs. 13, 14, 15.)[2]  Springsteen asserts that West criticized him for problems that Springsteen already addressed or resolved or that were not attributable to him.

For example, West authored a "status update" memo to Springsteen on September 30, 2010, in which West raised many concerns about the CCW unit's operations.  (*Id*. Ex. 13.)  Springsteen addressed many of the concerns.  (*See* Pl.'s Exs. 8 [establishing a quality control process], 7 [progress update], 17 [reflecting a meeting with the Sheriff's Department to change and improve the CCW database]).  However, West issued the identical memo, criticizing Springsteen for the same issues, in a "status update" on November 17, 2010.  (*Id*. Ex. 14.)  West acknowledged during his deposition in this matter that his November 17 memo asserted issues that Springsteen already had addressed or resolved.  (Pl.'s Resp. Ex. 7 at 225-26.)

---

[2]Exhibit 13 is a September 30, 2010, memo that identifies Wade as the author. According to Wade, she objected to her name appearing on the memo because she did not draft or approve the language.  (Pl.'s Resp. Ex. 4 at 134.)  The memo was based upon West's, not Wade's, meeting with Springsteen.  (*Id*. at 135.)

According to Johnson, who supervised Springsteen prior to September 2, 2010, she never had to discipline Springsteen and could not recall any performance issues with regard to him. (Pl.'s Resp. Ex. 6 at 17-18.) Johnson testified that if there had been performance issues, Springsteen addressed them. (*Id*.) Wade testified that "[Springsteen] was doing everything that he could to comply with the requirements being directed at him [by West]." (*Id*. Ex. 4 at 130-31.) She agreed with Springsteen's counsel that the tasks or assignments West gave Springsteen "could be perceived as" "oppressive, hostile, harassing, or retaliatory in nature" and that Springsteen lacked the available tools to comply with West's directives, no matter how reasonable. (*Id*. at 282-83, 288-89.)

On November 22, 2010, Springsteen was absent from work because he was summoned for jury duty. (Pl.'s Resp. Ex. 3 at 248; Ex. 20.) Springsteen claims that he sent a text message to West's cell phone the day before indicating that he would be absent from work. West acknowledged during his deposition that Springsteen was authorized to advise him via text or e-mail message when he was going to miss work, but denies that Springsteen did so in this instance. (*Id*. Ex. 7 at 236.) It is not disputed that Springsteen did send an email to Debra Gibson in the Clerk's office at 12:14 p.m. on November 22, indicating that he was attending jury duty. (Defs.' Mot. Ex. 22.) The following day, West suspended Springsteen for three days without pay for "insubordination" and "violation of department policies or rules" due to his absence the previous day, which West asserted left the Vitals division without a supervisor. (*Id*. Ex. 21.)

In early December 2010, Springsteen took a medical leave of absence from work

9

due to stress.  When he returned to the Clerk's office on February 11, 2011, Springsteen was informed that he would no longer be supervising the CCW unit and he was assigned to handle wedding ceremonies.  Springsteen's work station also was moved to Room 228, which he claims was a storage closet that lacked adequate heating and cooling.  (*See* Pl.'s Resp. Ex. 3 at 260).  Defendants contend that other employees had used the room and that it only was used as a storage closet after Springsteen's termination (*see* Defs.' Mot. Ex. 2 at 167-68; Ex. 6 at 278-79.)  Plaintiff's job title and salary, however, remained the same.

Defendants claim that, "after West took over [Springsteen's] responsibilities for Vitals in September 2010, he slowly began to learn the full extent of the delays and disorganization in the CCW unit for which Springsteen was responsible."  (Defs.' Br. in Supp. of Mot. at 8.)  On February 18, 2011, West authored a "statement of events" detailing problems in the CCW unit and Springsteen's alleged failings.  (Pl.'s Resp. Ex. 23.)  This document was not shared with Springsteen and discussed events pre-dating Springsteen's medical leave of absence.  (*Id.*; Ex. 7 at 244, 246, 247.)  Springsteen contends that the only purpose for the document was to "paper" his personnel file to justify his subsequent termination.

West's February 18, 2011 statement of events describes an inventory of Springsteen's desk area on November 29, 2010, while he was on medical leave.  (*Id.* Ex. 23.)  The statement reports that "[t]his inventory revealed several files scattered around the desk, under the desk, as well as tubs of documents, approximately 1,000, in various stages of completion, from previous Gun boards (2 to 3 months prior)."  (*Id.*)  Allegedly

10

the inventory further revealed "at least 350 files in boxes from the October 13, 2010 gunboard" without a "note or indication as to the status of these files" and "at least 20 pieces of returned mail, some with permits, some without. Mail was unsealed, some had letters in backward, making it impossible to see the addressees." (*Id.*) In addition, it is noted that "[o]ver 2,000 applicant files have been entered into the system either without all of the necessary information, or incorrect information" and that "files have been misfiled, which makes it almost impossible to locate the file to even address issues." (*Id.*) Finally, the statement of events describes that the "customer service phone line receives at least 60 inquiries and complaints from unhappy clients who have either been given the wrong information, or no information at all." (*Id.*)

On March 15, 2011, Springsteen did not report to work. At 6:30 a.m., he sent an e-mail to West informing him that he would be absent. (Pl.'s Resp. Ex. 24.) The following day, Debra Gibson sent an e-mail to Springsteen, indicating that the attendance policy requires him to speak directly to the Chief Deputy County Clerk (i.e. West) if he is not able to report to work. Allegedly because he did not speak directly to West to report his absence and because of his "poor quality of work," West discharged Springsteen on March 16, 2011. (Defs.' Mot. Ex. 2 at 171-72; Ex. 6 at 251-55.) Springsteen, however, was not given a reason for his termination. (Pl.'s Resp. Ex. 4 at 146-47.) West consulted with Garrett in the decision to terminate Springsteen. (Defs.' Mot. Ex. 6 at 252-53.)

## II.   Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate

11

"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  The

court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513.

## III.   Applicable Law and Analysis

### A.   First Amendment Retaliation Claim

Defendants contend that Springsteen's First Amendment retaliation claim fails because he did not engage in protected speech when he spoke to IA, but rather as a public employee pursuant to his job duties.  Alternatively, Defendants argue that the claim fails because the government's interest in restricting his speech outweighs his free speech rights and/or because there was a legitimate, non-retaliatory reason for his termination. As to Garrett in her official capacity and Wayne County, Defendants also argue that Springsteen fails to establish a policy to hold them liable for any constitutional violation.

### 1.   Whether Springsteen's speech is entitled to First Amendment Protection

To prevail on his First Amendment retaliation claim, Springsteen must show that: (1) he made statements protected by the First Amendment; (2) he suffered an adverse employment action; and (3) "the adverse action was motivated at least in part as a response to the exercise of his constitutional rights." *Fox v. Traverse City Area Pub. Sch. Bd. of Ed.*, 605 F.3d 345, 348 (6th Cir. 2010) (additional quotation marks and citations omitted).  Even if Springsteen establishes these elements, Defendants may be entitled to summary judgment if they can demonstrate that they would have taken the same action even in the absence of the protected speech.  *See v. City of Elyria*, 502 F.3d 484, 494 n.3

13

(6th Cir. 2007) (citing *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568 (1977)).

As a governmental employee, for his speech to receive First Amendment protection, Springsteen must have been speaking "as a citizen" about "matters of public concern." *Id.* (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007)). Even then, only "the *possibility* of a First Amendment claim arises." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006) (emphasis added). "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* This is determined by engaging in a "balancing of the competing interests surrounding the speech and its consequences." *Id.* at 423, 126 S. Ct. at 1961.

In *Garcetti*, the Supreme Court considered whether a deputy district attorney was speaking as a citizen when he made statements in a memo to his supervisor recommending dismissal of a case because an affidavit supporting the case contained, what he believed to be, serious misrepresentations. The Court concluded that the speech was not protected by the First Amendment because the deputy district attorney made the statements pursuant to his duties as a calendar deputy. 547 U.S. at 421, 126 S. Ct. at 1959-60. The Court held:

> That consideration– the fact that Ceballos [the deputy district attorney] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case– distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant

14

> to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. . . .
>
> . . .
>
> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id*. at 421, 126 S. Ct. at 1960.

In reaching its decision in *Garcetti*, the Supreme Court did not find it dispositive that "Ceballos expressed his views inside his office, rather than publicly," or that "[t]he memo concerned the subject matter of [his] employment," expressing that "[t]he First Amendment protects some expressions related to the speaker's job." (*Id*. at 420-21, 126 S. Ct. at 1959).  The Court declined to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," however, because the parties did not dispute that Ceballos wrote his memo pursuant to his employment duties.  *Id*. at 424, 126 S. Ct. at 1961.  Although the Court did caution that "[t]he proper inquiry is a practical one" and that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the employee's professional duties for First Amendment purposes."  *Id*. at 424-25, 126 S. Ct. at 1961-62.  The Sixth Circuit has determined that the question of whether a public employee's speech is protected is one of law.  *Fox*, 605 F.3d at 350 (citing *Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007)).

15

There can be no dispute that Springsteen was addressing a "matter of public concern" when he informed IA about conduct that he believed reflected corruption within the Clerk's office. *See, e.g., See*, 502 F.3d at 493 (concluding that a police officer's statements to the FBI regarding corruption within his police department were matters of public concern because "[s]tatements exposing possible corruption in a police department are exactly the type of statements that demand strong First Amendment protections."); *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) (providing that "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law."). While it is a closer question whether Springsteen was speaking "as a citizen" when he spoke to IA, the Court concludes that he was.

While Defendants point out that Springsteen spoke with members of the Wayne County Sheriff's office as part of his official duties overseeing the CCW unit, those usual conversations did not extend to IA and did not concern alleged corruption within the Clerk's office. Distinct from Springsteen's statements to IA, his everyday interactions were with Sheriff's office deputies for the purpose of gathering information relevant to whether a CCW permit should issue and to address problems in the process (e.g., permits issued that should have been denied, permits that should have been issued but were stalled or denied, incorrect information entered with respect to permits). The memo addressed to Springsteen the day he informed his supervisors that he had spoken with IA suggests that even Defendants– at least at the time– viewed IA as an "outside entity" and Springsteen's discussions with its investigators as being "not in the usual course of

16

business."  (*See* Pl.'s Resp. Ex. 12.)

Defendants nevertheless argue that Springsteen's speech is not protected because it "owes its existence to [his] professional responsibilities" because he only knew the information that he conveyed to IA because of his official position in charge of the CCW unit.  (*See* Defs.' Reply Br. at 2, quoting *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960.) This Court does not believe that this was what the Supreme Court meant when it stated that "[r]estricting speech that *owes its existence to a public employee's professional responsibilities* does not infringe any liberties the employee might have enjoyed as a private citizen."  *Garcetti*, 547 U.S. at 421-22, 126 S. Ct. at 1960 (emphasis added). Were this the intended meaning, the Sixth Circuit would not have found the plaintiff's speech to the FBI in *See* protected by the First Amendment and, in *Hilden v. Hurley Medical Center*, Judge Lawson would have had no basis to distinguish the plaintiffs' complaints to their supervisors or other hospital personnel (which he held was not protected) from their same complaints to an outside regulatory agency (which he found protected).  831 F. Supp. 2d 1024, 1039 (E.D. Mich. 2011).  In both cases, public employees reported information only known to them because of their job responsibilities. As this Court previously stated on this point:

> It is irrelevant that [the p]laintiff conveyed knowledge gained through his employment.  The Supreme Court has made clear that the public has a right to hear public employees' views even on matters related to their employers, as "public employees are 'the members of a community most likely to have informed and definite opinions' about a wide range of matters related, directly or indirectly, to their employment."

*Majchrzak v. Cnty. of Wayne*, 838 F. Supp. 2d 586, 595 (E.D. Mich. 2011) (quoting

*Borough of Duryea v. Guarnieri*, – U.S. –, 131 S. Ct. 2488, 2500 (2011) (quoting

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 572, 88 S. Ct. 1731, 1736 (1968)).

  In this Court's view, the fact that IA and the Clerk's office are both subdivisions of

Wayne County also does not render Springsteen's speech unprotected.  This fact may

distinguish Springsteen's case from *See*, where the plaintiff reported corruption within his

police department to an outside law enforcement agency (i.e., the FBI).  Nevertheless,

Springsteen's speech still is more akin to the plaintiff's speech in *See* than in those cases

where the Sixth Circuit has found the speech unprotected.  That is, he was cooperating

with law enforcement regarding a criminal investigation of his employer rather than

presenting the "quintessential employee beef" up the chain of command.  *Compare*

*Marohnic*, 800 F.2d at 616 (describing the employee's protected speech to police officers

regarding a criminal investigation of his public employer as being "induced by civic

commitment [to cooperate in a police investigation], not by an employment related

dispute"), *with Fox*, 605 F.3d at 349 (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th

Cir. 2008)) (distinguishing the plaintiff's case because "[her] complaints were directed

solely to her supervisor" and noting that "[c]ases from other circuits are consistent in

holding that when a public employee raises complaints or concerns up the chain of

command at his workplace about his job duties, that speech is undertaken in the course of

performing his job.")  The fact that the plaintiff in *See* initiated contact with law

enforcement whereas Springsteen was instructed to contact IA is not determinative,

18

either.  As the Sixth Circuit stated in *Marohnic*: "Public policy strongly supports and encourages protecting speech made *at the behest of* law enforcement officials." *Marohnic*, 800 F.2d at 616 (emphasis added).

As indicated above, even if Springsteen was speaking as a citizen concerning a matter of public concern, only the possibility of First Amendment protection arises.  The speech still may be lawfully regulated if the governmental entity's interests in doing so outweigh the employee's free speech interests: "The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [public entity], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 301 U.S. at 568, 88 S. Ct. at 1734-35 (1968).  When balancing the public employee's and employer's respective interests, the Sixth Circuit has identified the following considerations for courts to consider:

> [W]hether an employee's comments meaningfully interfere with the performance of [his or] her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees. . . . Relevant factors in this regard include the manner, time, and place of the employee's expression, as well as the context in which the dispute arose.

*Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) (internal quotation marks and citations omitted).

Defendants argue that "the County's interest in maintaining the efficient operation of the Clerk's office– a customer-service driven environment– justifies the challenged

19

adverse employment actions." (Defs.' Br. in Support of Mot. at 12.) In support of this argument, Defendants state that "Plaintiff's position was critical to the operation of the Clerk's office, and the performance of the CCW unit he managed was generating an unprecedented number of complaints." (*Id.*) Defendants' assertions, however, address only how Springsteen's job performance, not his speech, impacted the efficient operation of the CCW unit and/or Clerk's office. Defendants offer no evidence suggesting that Springsteen's statements to IA negatively effected the Clerk's office.

Thus the ability of Springsteen to succeed on his First Amendment retaliation claim turns on whether his speech motivated Defendants' decision to terminate his employment and whether Defendants' asserted non-retaliatory reasons for their decision were a mere pretext for retaliation.

### 2.     Whether Springsteen's termination was motivated by retaliatory animus or legitimate reasons

Based on the evidence presented, this Court believes that a reasonable jury could find that Defendants, in response to Springsteen's statements to IA, manufactured reasons to end his employment.

For example, there is the memo Defendants issued to Springsteen on the day they learned that he had spoken with IA, unquestionably stating their displeasure with his conduct. Additionally, there is evidence that in response to Springsteen's speech, Garrett expressly stated that she could no longer stand Springsteen and wanted him out of the

20

Clerk's office.[3]  Soon after learning about his discussions with IA, Defendants suspended Springsteen for *three days without pay* because he was absent from work for one day for jury duty.  The severity of the punishment relative to the misconduct could suggest to a jury that Defendants were out to get Springsteen in retaliation for his speech.  As well, there is a genuine issue as to whether Springsteen in fact was absent in violation of his employer's policies where he claims he informed West of his absence via text and West testified that he had told Springsteen this was an effective means to report an absence.

Further, Springsteen's supervisor never criticized his job performance prior to his discussions with IA; but after Springsteen alerted Defendants to his speech, several memos were authored by West and placed in Springsteen's personnel file criticizing his job performance.  Springsteen presents evidence to suggest to a jury that Defendants simply were papering Springsteen's file to support his subsequent termination.  For example, Springsteen shows that West criticized him for problems and/or errors that were not resolved by other supervisors while he was on medical leave, were stale, had already been resolved by Springsteen, or were impossible to resolve under the staffing and

---

[3]Defendants argue that Garrett's "stray remarks" that "bear[] no apparent connection to the challenged decision do not constitute evidence of retaliation."  (Defs.' Reply Br. at 8.)  It is true that "isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (internal quotation marks and citations omitted).  Nevertheless, retaliatory remarks referring directly to the plaintiff may support an inference of retaliation.  *See id.*  Moreover, in this Court's view, there is nothing ambiguous or abstract about Garrett's supposed comments concerning Springsteen after he revealed his discussions with IA.

funding constraints Springsteen faced. Notably it was only once Springsteen was on medical leave that West finally approved staff overtime to address the CCW unit's backlog, despite Springsteen's previous requests for such approval.

Defendants are correct that "[Springsteen] may not simply question, or seek to have the jury second guess, the soundness of the County's business judgment regarding what is an acceptable level of mismanagement in the CCW unit." (Defs.' Br. in Supp. of Mot. at 20.) However, Springsteen can and has presented evidence to raise a genuine issue of fact as to whether the mismanagement was attributable to him. He also has presented sufficient evidence to support "[h]is subjective belief[] that he was retaliated against" in response to his speech such that a reasonable juror could conclude that he was.

### 3. Whether Wayne County and Garrett in her official capacity are liable for any constitutional violation

Defendants argue that even if a violation of Springsteen's First Amendment rights occurred, Wayne County and Garrett in her official capacity are not liable because Springsteen cannot establish that the violation was attributable to a governmental policy. In other words, Defendants contend that Springsteen fails to show the existence of a County policy to deprive Clerk's office employees of their constitutional rights. Defendants, however, overlook the Supreme Court's holding in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292 (1986).

In *Monnell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978), the Supreme Court held that municipalities could be held liable under 42 U.S.C. § 1983

22

for deprivations of federal rights, but concluded that § 1983 did not support *respondeat*

*superior* liability. *Id.* at 691, 98 S. Ct. at 2036. The Court reasoned that "Congress did

not intend municipalities to be held liable unless action pursuant to official municipal

policy of some nature caused a constitutional tort." *Id.* In *Pembaur*, however, the Court

clarified that this "official policy" requirement did not preclude municipal liability "for a

single decision by municipal policymakers under appropriate circumstances." 476 U.S. at

480, 106 S. Ct. at 1298. The Court emphasized, however, that "not every decision by

municipal officers automatically subjects the municipality to § 1983 liability." *Id.* at 481,

106 S. Ct. at 1299. Instead, municipal liability "attaches only where the decisionmaker

possesses final authority to establish municipal policy with respect to the action ordered."

*Id.* In other words, the official must be "responsible for establishing final government

policy respecting such activity before the municipality can be held liable." *Id.* at 482-83,

106 S. Ct. 1299-1300.

Garrett is the highest official in the Clerk's office, i.e., the decisionmaker

responsible for establishing final policy respecting the Clerk's office. She testified that

the September 2 memo to Springsteen, advising him that he had deviated from Clerk's

office policy by speaking with an outside entity before clearing his speech with her or her

next-in-command, reflects the standard protocol of the office. (Pl.'s Resp. Ex. 5 at 101-

03.) Further, there is evidence indicating that Garrett was involved in the decision to get

Springsteen "out" of the Clerk's office in response to his speech to IA. As such, Wayne

County and Garrett in her official capacity can be held liable for the alleged violations of

23

Springsteen's First Amendment rights.

### 4. Conclusion as to Springsteen's First Amendment retaliation claim

For the reasons set forth above, the Court concludes that Springsteen engaged in speech that is entitled to First Amendment protection. He also has raised a genuine issue of material fact as to whether this speech, as opposed to his two work absences and alleged mismanagement of the CCW unit, was the reason for his termination. Because there is evidence suggesting that Garrett– the County Clerk with final decisionmaking authority respecting Clerk's office staffing and policy– was involved in the decision to terminate Springsteen, Wayne County and Garrett in her official capacity may be held liable if a constitutional violation is established. Defendants, therefore, are not entitled to summary judgment with respect to Springsteen's First Amendment retaliation claim.

### B. Whistleblower Protection Act Claim

Michigan's Whistleblower Protection Act ("WPA") "was enacted to encourage employees to assist in law enforcement and to protect employees who participate in whistleblowing activities." *Trepanier v. Nat'l Amusements, Inc.*, 250 Mich. App. 578, 584, 649 N.W.2d 754, 758 (2002). The statute provides in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to the law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an

24

investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362.  To prevail on a claim under the WPA, a plaintiff must first

establish a *prima facie* case by showing that: (1) he engaged in activity protected under

the WPA, (2) he was discharged, and (3) a causal connection existed between the

protected activity and the discharge.  *Shallal v. Catholic Soc. Servs.*, 455 Mich. 604, 610,

566 N.W.2d 571, 574 (1997).  If the plaintiff succeeds in establishing his *prima facie*

case, the burden shifts to the defendant to articulate a legitimate reason for the discharge.

*See Phinney v. Verbrugge*, 222 Mich. App. 513, 563, 564 N.W.2d 532, 558 (1997).  If the

defendant carries this burden, the plaintiff may prevail by proving that the reason offered

was a pretext for the discharge.  *Id.* at 563, 564 N.W.2d at 558.

Defendants seek summary judgment with respect to Springsteen's WPA claim,

contending that he cannot establish a causal connection between his August 2010 meeting

with IA and his March 16, 2011 termination.[4]  Defendants argue that many of the

harassing and retaliatory actions that Springsteen challenges also occurred prior to his

meeting with IA and thus he "was treated the same before and after his alleged protected

activity" and "it cannot be concluded that the conduct about which he now complains was

in any way related to his discussions with IA."  (Defs.' Br. in Supp. of Mot. at 19.)

_____

[4]Defendants spend considerable time in their initial brief arguing that no other
actions were taken against Springsteen that were adverse.  (*See* Defs.' Br. in Supp. of
Mot. at 17-18.)  Springsteen, however, focuses only on his termination in responding to
Defendants' arguments for summary judgment with respect to his WPA claim.  (*See* Pl.'s
Resp. Br. at 27.)

Alternatively, even if he could establish a causal connection, Defendants argue that Springsteen cannot demonstrate that Defendants' legitimate reasons for his termination were pretextual.

While the approximate seven-months span of time between Springsteen's protected activity and termination may be too long to raise an inference of discrimination, it is not too great to conclude that the two events are unrelated.  If Springsteen was relying on proximity alone, he would not be able to establish his *prima facie* case.  *See, e.g., Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (indicating that "the *mere* fact that [the plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation.")  However, as discussed with respect to his First Amendment claim, Springsteen sets forth actions by Defendants during this span of time (*see supra*) that could lead a reasonable jury to conclude that they were preparing for his eventual termination in retaliation for his protected conduct.  For the reasons discussed above, he also raises a genuine issue of material fact as to whether Defendants' proffered reasons for the decision to terminate his employment were pretextual.

The Court therefore concludes that Defendants also are not entitled to summary judgment with respect to Springsteen's WPA claim.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is **DENIED**.

26

Date: August 8, 2012                     s/PATRICK J. DUGGAN
                                         UNITED STATES DISTRICT JUDGE

Copies to:
Michael L. Pitt, Esq.
Kevin M. Carlson, Esq.
Jerome R. Watson, Esq.
Adam S. Forman, Esq.
Brian M. Schwartz, Esq.
Ronnie E. Cromer Jr., Esq.